Bernard M. Hansen, Esq. (Cal. Bar No. 115751)
3465 Camino Del Rio South, Suite 250
San Diego, CA  92108-3905
(619) 283-3371
Facsimile (619) 282-8900
bernardmhansen@sbcglobal.net

Attorney for Counterclaimants,
David Kahn, Individually and as Assignee

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>DAVID KAHN<br><br>        Debtor.<br><br>Case No. 10-12306-PB7 | ADVERSARY PROCEEDING<br>NO. 10-90637-PB7<br><br>COUNTERCLAIM FOR:<br>(A) NEGLIGENT<br>MISREPRESENTATION;<br>(B) INTENTIONAL<br>MISREPRESENTATION; AND<br>(C) INTENTIONAL<br>INTERFERENCE WITH<br>BUSINESS OPPORTUNITY |
| COLD SMOKE FINANCE, LLC<br>        Plaintiff,<br>vs.<br>DAVID KAHN<br>        Defendant. | |
| DAVID KAHN, INDIVIDUALLY AND AS<br>ASSIGNEE<br>        Counterclaimants.<br>vs.<br>COLD SMOKE FINANCE, LLC, DAN<br>BROOKS, MIKE TRAA and DAN BROOKS<br>AS THE EXECUTOR/TRUSTEE/FIDUCIARY<br>OF THE ESTATE/TRUST OF SAM A.<br>BROOKS, JR. (DECEASED)<br><br>        Counterdefendants. | |

Counterclaimants allege:

## JURISDICTION

1.      This action is a proceeding arising in or related to a case under chapter 7 of the Bankruptcy Code.  This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §1334 and General Order 312-D of the United States District Court, Southern District of California. This proceeding is a core proceeding pursuant to 28 U.S.C. §157(b)(2).

## PARTIES

2.      Cold Smoke Finance, LLC ("Smoke Finance") is a limited liability company organized and existing under the laws of the State of Georgia and is a counterdefendant herein.

3.      Dan Brooks is an individual, an attorney and a counterdefendant herein.  Mr. Brooks is the principal of Smoke Finance and wields sole control of Smoke Finance.  All decisions made by Smoke Finance as alleged herein were made or ratified by Mr. Brooks.  All acts undertaken by Smoke Finance as alleged herein were undertaken by or at the direction of Mr. Brooks.

4.      Dan Brooks is the son of Sam A. Brooks, Jr.  Some years ago, Sam A. Brooks, Jr. passed away.  Dan Brooks was appointed a fiduciary concerning his father's estate and any trusts related thereto (the "Sam Brooks' Estate/Trust").  Dan Brooks remained a fiduciary and was a fiduciary of the Sam Brooks' Estate/Trust (including any successor in interest to the Sam Brooks' Estate/Trust) at all times referenced herein.  Dan Brooks in his fiduciary capacity of the Sam Brooks' Estate/Trust (including any successor in interest to the Sam Brooks' Estate/Trust) is a counterdefendant.  As a fiduciary, Mr. Brooks controls the Sam Brooks' Estate/Trust.  All decisions made by the Sam Brooks' Estate/Trust as alleged herein were made or ratified by Mr. Brooks in his fiduciary capacity.  All acts undertaken by the Sam Brooks' Estate/Trust as alleged herein were undertaken by or at the direction of Mr. Brooks in his fiduciary capacity.

5.    Michael Traa is an individual and a counterdefendant herein.  At all relevant times mentioned herein, Michael Traa was the agent and representative of Smoke Finance, Mr. Brooks and each of them relating to all matters set forth herein.  At all relevant times mentioned herein, Mr. Traa held himself out as the agent and representative of Smoke Finance, Mr. Brooks and each of them relating to all matters set forth herein.  Smoke Finance, Mr. Brooks, Mr. Traa and Dan Brooks in his fiduciary capacity of the Sam Brooks' Estate/Trust are sometimes jointly referred to as the Counterdefendants.

6.    Mr. Kahn is an individual and a counterclaimant herein.  David Kahn has claimed his prepetition rights against Counterdefendants and each of them as exempt.

7.    On or about July 17, 2010, Kahn Capital Management, Inc. ("KCM"), KCM MC Holdings, LLC and David J. Kahn as Trustee of the David Kahn Trust U.D.T. dated October 1, 1990 and each of them assigned to Mr. Kahn all claims, choses in action, causes of action and claims for relief each of them respectively had against Smoke Finance, Mr. Brooks, Mr. Traa, Dan Brooks in his fiduciary capacity of the Sam Brooks' Estate/Trust and each of them, including, but not limited to the claims for relief asserted herein.   David Kahn, individually and David Kahn as assignee of KCM, KCM MC Holdings, LLC and David J. Kahn as Trustee of the David Kahn Trust U.D.T. dated October 1, 1990 and each of them are sometimes collectively referred to as "Mr. Kahn".

FIRST CLAIM FOR RELIEF

(NEGLIGENT MISREPRESENTATION)

8.    Mr. Kahn realleges and incorporates by reference paragraphs 1 through 7.

9.    On or about August 20, 2007, the Counterdefendants and each of them and Mr. Kahn met at KCM's office in La Jolla, California and a restaurant near-by.  The two main topics of conversation were: (a) The Media Cart Holdings, Inc. ("MCH") business opportunity; and (b)

the business relationship between, on the one hand, Counterdefendants and each of them and, on the other hand, All-Star Apparel, Tim McCallum and each of them.

10.     Relevant to the first topic, Mr. Kahn informed the Counterdefendants and each of them that beginning in August 2006, Mr. Kahn invested Five Million Dollars ($5,000,000) into MCH and held substantial stock interests and related interests in MCH.  Also, Mr. Kahn informed the Counterdefendants and each of them that he had invested in October 2006, One Million dollars ($1,000,000) in a private financing Agreement with the MCH founder regarding certain other entities holding MCH stocks, and potential options and warrants that were not public information.

11.     Mr. Kahn related his knowledge of public information regarding MCH to Counterdefendants and each of them. Subsequently, Counterdefendants and each of them obtained all or substantially all information available to the public to determine if they should invest in MCH.

12.     Subsequently, on May 17, 2007, the Counterdefendants signed a 5 year Confidentiality Agreement (CA) in favor of KCM.   KCM transferred information to Counterdefendants and each of them that was subject to and protected by the provisions of the CA. Said information was confidential and proprietary.  Said information revealed a competitive advantage to Mr. Kahn and a favorable investment advantage to Mr. Kahn including Performa's confidential communications along with Mr. Kahn's private investment holdings.  Further, Mr. Kahn disclosed private information regarding his belief that MCH could be on the verge of a buyout or similar transaction whereby MCH shareholders, option holders and warrant holders could earn a large return on their MCH investment.

13.     Mr. Traa was informed in August 2007 that Mr. McCallum intended to use funds from sales of product or loans from contingent purchase orders (contingent on acquiring

licenses) generated by All-Star to purchase up to a Five Million Dollar ($5,000,000) position in MCH stock or a Five Million Dollar ($5,000,000) position in Mr. Kahn's MCH holdings. Subsequently, Mr. McCallum confirmed to Mr. Traa that he in fact had been allowed to invest in Mr Kahn's entities position in MCH in November 2007 wherein Mr. Traa believed Mr McCallum owned a position of approximately 4.5% of MCH, a company with an approximate valuation of Fifty Million Dollars ($50,000,000) at that time.

14.    Relevant to the second topic (set forth in paragraph 9(b) above), Mr. Kahn told Counterdefendants and each of them at the their August 2006 meeting that Mr. Kahn held a 10% interest in the entity that owned or sold the All-Star patented products dating back to a 1999 Agreement which Mr Brook's and Mr Traa confirmed in emails in September 2008 prior to filing a lawsuit in January 2010 claiming they had no knowledge of such facts.

15.    Relevant to the second topic, Counterdefendants and each of them stated and represented to Mr. Kahn:

(a)    Cold Smoke had entered into a prior business relationship with All-Star Apparel, Tim McCallum and each of them;

(b)    Cold Smoke was providing millions of dollars in factored purchase order financing loans to All-Star Apparel;

(c)    All-Star Apparel was doing a great business with substantial sales that justified the amount of such purchase order financing loans;

(d)    All-Star Apparel was a credit worthy, thriving business; and

(e)    They were well pleased with All-Star Apparel's performance and well pleased with their business relationship with All-Star Apparel.

16.    The statements and representations made by Counterdefendants and each of them were false:

- 5 -

(a)    Cold Smoke was not providing millions of dollars in factored purchase order financing loans to All-Star.  The truth is that factored purchase orders were conditioned upon licenses on trademarked products being acquired to be actual purchase orders.

(b)    Apparel All-Star Apparel was not doing a great business with substantial sales that justified the amount of such loans;

(c)    All-Star Apparel was not a credit worthy, thriving business; and

(d)    No reasonable lender would have been well pleased with All-Star Apparel's performance or well pleased with its business relationship with All-Star Apparel, if such lender would have performed a proper due diligence in deciding whether to make the purported purchase order financing loans and in monitoring the repayment of the purported purchase order financing loans and in collecting the defaulted, purported purchase order financing loans.

17.    Counterdefendants and each of them were reckless in making these statements and could not have reasonably believed them for the reasons set forth in paragraphs 18-19.

18.    Cold Smoke undertook little or no due diligence of All-Star Apparel before making a series of purported purchase order financing loans totaling millions of dollars, including, but not limited to:

(a)    Cold Smoke did not have normal or customary policies or procedures in place to make purported purchase order financing loans with a reasonable amount of risk or to make purported purchase order financing loans to All-Star Apparel;

(b)    Cold Smoke failed to ask for any documents a prudent lender would ask for;

(c)    Cold Smoke failed to investigate All-Star Apparel's current or past financial condition; and

(d)    Cold Smoke failed to investigate All-Star Apparel's ability to repay the purported purchase order financing loans and failed to verify that there were in fact actual purchase orders.

19.    Additionally, Cold Smoke failed to monitor the progress of the licenses required to obtain actual purchase orders on trademarked products that would lead to the repayment of its purported purchase order financing loans to All-Star Apparel.  Cold Smoke did not have normal or customary policies or procedures in place to monitor the repayment of purported purchase order financing loans or monitor the progress of the licenses required to obtain actual purchase orders on copyright products that would lead to the repayment of All-Star Apparel's purported purchase order financing loans.  Cold Smoke did not know the amount of All-Star Apparel's actual purchase order sales.

20.    Additionally, Cold Smoke failed to take reasonable action when All-Star Apparel defaulted on the purported purchase order financing loans.  Cold Smoke did not have normal or customary policies or procedures in place to collect on defaulted loans or to collect on All-Star Apparel's defaulted loans.

21.    Counterdefendants and each of them made said misrepresentations with the intent to deceive Mr. Kahn and have him rely on them.  Specifically, Counterdefendants and each of them knew that Mr. McCallum was speaking with Mr. Kahn about a transaction that can generally be described as:

(a)    Mr. McCallum would invest up to Five Million Dollar ($5,000,000) position in MCH stock or a Five Million Dollar ($5,000,000) position in Mr. Kahn's MCH holdings. Subsequently, Mr. McCallum confirmed to Mr. Traa that he in fact had been allowed to invest in Mr Kahn's position in MCH in November 2007.  Mr. Traa was informed and believed Mr. McCallum owned a position of approximately 4.5% of MCH, a company with an approximate valuation of Fifty Million Dollars $50,000,000 at that time.  Mr. McCallum in fact agreed to pay $1,000,000 to Mr. Kahn to purchase a profit participation position in Mr. Kahn's MCH

holdings.  Purchasing a position in Mr. Kahn's MCH holdings had distinct economic advantages over purchasing MCH stock directly from MCH;

(b)    KCM would give line of credit financing to All-Star Apparel with a repayment term longer than that being currently provided by Cold Smoke; and

(c)    McCallum would transfer 10% of his current holdings of All-Star Apparel stock to Mr. Kahn as part of the profit participation agreement.

22.    Counterdefendants and each of them made said misrepresentations to Mr. Kahn so that Mr. Kahn would enter the transaction described in the previous paragraph.  Said transaction would be a direct benefit to Counterdefendants and each of them.  First, Counterdefendants and each of them believed there was a huge upside to MCH and investing in Mr. Kahn's MCH holdings was economically superior to investing directly with MCH or its founder.  The $1,000,000 deal was not open to Counterdefendants and each of them.  Counterdefendants and each of them could take advantage of this deal only through Mr. McCallum.  Also, if All-Star Apparel was some day unable to repay its loans burdened with exorbitant "consulting fees", Cold Smoke believed it could seize this investment with Mr. Kahn as part of Cold Smoke's "Loan to Own" policy.  Second, the term of Cold Smoke's loans were too short to cover the accounting cycle for the sale of All-Star Apparel's product.  Counterdefendants and each of them wanted a second lender making longer term loans to All-Star Apparel.

23.    Mr. Kahn reasonably relied on Counterdefendants' misrepresentations.  Counterdefendants and each of them appeared to be knowledgeable and competent business people.    Additionally, when Counterdefendants were informed of the MCH investment opportunity, they acted as prudent investors and immediately started their own comprehensive due diligence.

24.     Based on the misrepresentations of Counterdefendants and each of them, Mr. Kahn went forward with a three part sale of the All-Star / Mr. Kahn participation position and suffered monetary damages as a direct result.  As part of that transaction, Mr. Kahn spent One Million Dollars ($1,000,000) buying MCH stock from the founder of MCH.  Mr. Kahn would not have made this purchase, but for Counterdefendants' misrepresentations. The value of this stock fell from a purchase price of $1,000,000 to $316,888 at the time of its subsequent sale resulting in damages to Mr. Kahn of $683,112 plus interest to date of $167,316 and the legal fees to collect.

25.     Based on the misrepresentations of Counterdefendants and each of them, Mr. Kahn paid Counterdefendants and each of them an additional $110,000 in interest and fees for a short term loan to expedite the purchase of the $1,000,000 in MCH stock from the founder.  This is an additional $110,000 in damages plus interest to date of $34,430 and the legal fees to collect.

26.     Based on the misrepresentations of Counterdefendants and each of them, KCM loaned up to Six Hundred Thousand Dollars ($600,000) to All-Star Apparel on a line of credit. All-Star Apparel failed to repay the line of credit loan.  There is now due, owing and unpaid the sum of approximately Two Hundred Fifty Thousand Dollars ($250,000).   The line of credit agreement also contained an indemnification agreement.   All-Star Apparel has breached the indemnification agreement and Mr. Kahn has incurred legal fees and other damages in excess of $150,000.  Mr. Kahn has been damaged in excess of $400,000 to date.

27.     The acts of Counterdefendants and each of them mandate an award of punitive damages in an amount to be determined by the Court.

SECOND CLAIM FOR RELIEF

(INTENTIONAL MISREPRESENTATION)

28.     Mr. Kahn realleges and incorporates by reference paragraphs 1 through 27.

29.    In August 2007, Counterdefendants and each of them stated and represented to Mr. Kahn:

(a)    Cold Smoke had entered into a prior business relationship with All-Star Apparel, Tim McCallum and each of them;

(b)    Cold Smoke was providing millions of dollars in factored purchase order financing loans to All-Star Apparel;

(c)    All-Star Apparel was doing a great business with substantial sales that justified the amount of such purchase order financing loans;

(d)    All-Star Apparel was a credit worthy, thriving business; and

(e)    They were well pleased with All-Star Apparel's performance and well pleased with their business relationship with All-Star Apparel.

30.    The statements and representations made by Counterdefendants and each of them were false:

(a)    Cold Smoke was not providing millions of dollars in factored purchase order financing loans to All-Star.  The truth is that factored purchase orders were conditioned upon licenses on trademarked products being acquired to be actual purchase orders.

(b)    Apparel All-Star Apparel was not doing a great business with substantial sales that justified the amount of such loans;

(c)    All-Star Apparel was not a credit worthy, thriving business; and

(d)    No reasonable lender would have been well pleased with All-Star Apparel's performance or well pleased with its business relationship with All-Star Apparel, if such lender would have performed a proper due diligence in deciding whether to make the purported purchase order financing loans and in monitoring the repayment of the purported purchase order financing loans and in collecting the defaulted, purported purchase order financing loans.

- 10 -

31.     Counterdefendants and each of them knew these statements and representations were false when they were made.

32.     Counterdefendants and each of them made said misrepresentations with the intent to deceive Mr. Kahn and have him rely on them.  Specifically, Counterdefendants and each of them knew that Mr. McCallum was speaking with Mr. Kahn about a transaction that can generally be described as:

(a)     Mr. McCallum would invest up to Five Million Dollar ($5,000,000) position in MCH stock or a Five Million Dollar ($5,000,000) position in Mr. Kahn's MCH holdings. Subsequently, Mr. McCallum confirmed to Mr. Traa that he in fact had been allowed to invest in Mr. Kahn's position in MCH in November 2007.  Mr. Traa was informed and believed Mr. McCallum owned a position of approximately 4.5% of MCH, a company with an approximate valuation of Fifty Million Dollars $50,000,000 at that time. McCallum in fact agreed to pay $1,000,000 to Mr. Kahn to purchase a profit participation position in Mr. Kahn's MCH holdings.  Purchasing a position in Mr. Kahn's MCH holdings had distinct economic advantages over purchasing MCH stock directly from MCH;

(b)     KCM would give line of credit financing to All-Star Apparel with a repayment term longer than that being currently provided by Cold Smoke; and

(c)     McCallum would transfer 10% of his current holdings of All-Star Apparel stock to Mr. Kahn as part of the profit participation agreement.

33.     Counterdefendants and each of them made said misrepresentations to Mr. Kahn so that Mr. Kahn would enter the transaction described in the previous paragraph.  Said transaction would be a direct benefit to Counterdefendants and each of them.  First, Counterdefendants and each of them believed there was a huge upside to MCH and investing in Mr. Kahn's MCH holdings was economically superior to investing directly with MCH or its

founder.   The $1,000,000 deal was not open to Counterdefendants and each of them.  Counterdefendants and each of them could take advantage of this deal only through Mr. McCallum.  Also, if All-Star Apparel was some day unable to repay its loans burdened with exorbitant "consulting fees" that were in fact hidden interest charges per Mr. Traa's admissions via email to Mr. Brooks.  Cold Smoke believed it could seize this investment with Mr. Kahn as part of Cold Smoke's "Loan to Own" policy.  Second, the term of Cold Smoke's loans were too short to cover the accounting cycle for the sale of All-Star Apparel's product.  Counterdefendants and each of them wanted a second lender making longer term loans to All-Star Apparel.

34.    Mr. Kahn reasonably relied on Counterdefendants' misrepresentations.  Counterdefendants appeared to be knowledgeable and competent business people.  Additionally, when Counterdefendants were informed of the MCH investment opportunity, they acted as prudent investors and immediately started their comprehensive due diligence.

35.    Based on the misrepresentations of Counterdefendants and each of them, Mr. Kahn went forward with a three part sale of the All-Star / Mr. Kahn participation position and suffered monetary damages as a direct result.  As part of that transaction, Mr. Kahn spent One Million Dollars ($1,000,000) buying MCH stock from the founder of MCH.  Mr. Kahn would not have made this purchase, but for Counterdefendants' misrepresentations. The value of this stock fell from a purchase price of $1,000,000 to $316,888 at the time of its subsequent sale resulting in damages to Mr. Kahn of $683,112 plus interest to date of $167,316 and the legal fees to collect.

36.    Based on the misrepresentations of Counterdefendants and each of them, Mr. Kahn paid Counterdefendants and each of them an additional $110,000 in interest and fees for a

short term loan to expedite the purchase of the $1,000,000 in MCH stock from the founder.  This is an additional $110,000 in damages plus interest to date of $34,430 and the legal fees to collect.

35.   Based on the misrepresentations of Counterdefendants and each of them, KCM loaned up to Six Hundred Thousand Dollars ($600,000) to All-Star Apparel on a line of credit. All-Star Apparel failed to repay the line of credit loan.  There is now due, owing and unpaid the sum of approximately Two Hundred Fifty Thousand Dollars ($250,000).  The line of credit agreement also contained an indemnification agreement.  All-Star Apparel has breached the indemnification agreement and Mr. Kahn has incurred legal fees and other damages in excess of $150,000.  Mr. Kahn has been damaged in excess of $400,000 to date.

36.   The acts of Counterdefendants and each of them mandate an award of punitive damages in an amount to be determined by the Court.

THIRD CLAIM FOR RELIEF

(INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE)

37.   Mr. Kahn realleges and incorporates by reference paragraphs 1 through 36.

38.   Mr. Kahn has a long standing economic relationship with MCH.  In addition to the funds Mr. Kahn has invested, Mr. Kahn has raised money for MCH by contacting third parties and explaining the MCH investment.  Mr. Kahn has served on the Board of Directors. Presently, Mr. Kahn has an economic relationship with MCH and he strongly believes there will be future economic benefit to him based on this economic relationship as there has been in the past.

39.   Counterdefendants and each of them were aware of the long standing economic relationship between Mr. Kahn and MCH.

40.   Counterdefendants and each of them committed intentional acts designed to disrupt the relationship, as set forth herein.

41.     Counterdefendants and each of them knew the annual shareholder meeting for MCH was January 11, 2010 and further knew Mr. Kahn was trying to get reelected to the Board of Directors.   In addition to the rights and duties a MCH board member has to influence the direction of MCH, MCH board members receive compensation in the form of options during their tenure.

42.     Counterdefendants and each of them created a plan to torpedo the relationship between Mr. Kahn and MCH, including, but not limited to filing a complaint for fraud and RICO violations on January 4, 2010, a week before the shareholder meeting.

43.     By way of background, on November 05, 2009, Mr. Traa sent a fax to Mr. Brooks.  At the top of the fax, it states in hand writing: "Dan Didn't want to email".  The email states in relevant part: "As I told Gooch yesterday I have been told Kahn is bleeding badly right now and doesn't have resources and has been in fact borrowing money again to stay afloat so hitting him sooner rather than later is probably to your advantage."

44.     On January 4, 2010, Counterdefendants and each of them, in the name of Smoke Finance, filed a lawsuit (the "Lawsuit") against Mr. Kahn and three Kahn entities, which included RICO claims.

45.     On January 5, 2010, Mr. Traa sent an email to Mr. Brooks stating:

> Point being he is now as fragile as he is ever going to get and the stocks [sic] value is as low as it will ever be, so now is the time to push and make things hard for him if you wanted.  I am sure if you sent in your proxy vote or not for the share holder meeting this coming Monday?  I will send you a blank copy (attached) –
>
> I am giving my vote to Thomas for as Kahn is trying to get a board seat right now in the company and that just can't happen!!
> …
> He is scrambling trying to get votes right now for the board as well so any stress you can put on his plate this week, will also make loose [sic] some hair…"

- 14 -

46.     On January 6, 2010, Mr. Brooks responded to Mr. Traa in an email: "He has a fraud lawsuit pending against him.  I would think the board and shareholders would want to wait and see the outcome of that suit before allowing him to be a board member."

47.     Later on January 6, 2010, Mr. Traa responded to Mr. Brooks: "Good to know – do you have any info that I can give to folks on this by chance?  A PDF file on the suit would be nice to have so I can email it to Brice."

48.     Prior to the annual shareholder meeting, Counterdefendants and each of them informed other shareholders and officers and directors of MCH about Mr. Kahn's alleged bad acts and used the Lawsuit to buttress their allegations.

49.     Counterdefendants and each of them lacked probable cause to file the Lawsuit.  Certain of the claims for relief, including the RICO claims for relief, had no basis in law.  They would have been dismissed, if a motion to dismiss were under Rule 12(b) of the F.R.Civ.P.

50.     Additionally, the Lawsuit was filed with a malicious intent.  First, Counterdefendants and each of them desired to hurt Mr. Kahn's economic relationship with MCH.  The Lawsuit was filed a few days before the annual share holder meeting.  Counterdefendants and each of them immediately communicated the filing of the Lawsuit and the contents of the Lawsuit to other shareholders and officers and directors of MCH.

51.     Second, Counterdefendants and each of them filed the lawsuit in federal court with the RICO claims mostly in an attempt to scare Mr. Kahn and force a settlement.

52.     The acts of the Counterdefendants and each of them caused an actual disruption, including, but not limited to, some shareholders, officers or directors of MCH withdrew their support from Mr. Kahn in general and also withdrew support for his bid to win a board seat.

53.     Mr. Kahn has suffered direct damages as a result of the acts of the Counterdefendants. The specifics include damage to Mr. Kahn's economic relationship with MCH, damage to Mr. Kahn's reputation, damage to Mr. Kahn's ability to raise funds, damage to

Mr. Kahn's ability to become a Board member of MCH, damage to Mr. Kahn's ability to acquire additional options and warrants of MCH. The exact amount of damages has not yet been determined, but the financial losses are substantial.

54. The acts of Counterdefendants and each of them mandate an award of punitive damages in an amount to be determined by the Court.

RIGHT TO AMEND

55. Counterclaimants and each of them fully reserve their right to file an amended counterclaim or seek judicial leave to file an amended counterclaim.

PRAYER

Counterclaimants and each of them pray:

A.    On the First and Second Claims for Relief:

1.    $683,112 for the decrease in value of the stock that Mr. Kahn would not have purchased;

2.    Interest on the sum of $683,112 at the maximum legal rate;

3.    $110,000 in loan fees and interest that Mr. Kahn would not have incurred;

4.    Interest on the sum of $110,000 at the maximum legal rate;

5.    $250,000 in unpaid loans;

6.    Interest on the sum of $250,000 at the maximum legal rate;

7.    Legal fees and other damages in excess of $150,000, (and continuing to accrue) caused by All-Star Apparel's breach of the indemnification agreement;

8.    Interest on the sum of $150,000+ at the maximum legal rate;

9.    Punitive damages in an amount to be determined by the Court;

10.   Attorneys' fees and costs; and

11.   Such other and further relief as the Court deems appropriate or is subsequently requested.

- 16 -

B.      On the Third Claim for Relief:

        1.      All monetary damages (the exact amount of montetary damages has not yet been determined) resulting from the acts of the Counterdefendants, including, but not limited to:

                a.      damage to Mr. Kahn's economic relationship with MCH;

                b.      damage to Mr. Kahn's reputation;

                c.      damage to Mr. Kahn's ability to raise funds;

                d.      damage to Mr. Kahn's ability to become a Board member of MCH;

                e.      damage to Mr. Kahn's ability to acquire additional options and warrants of MCH;

        2.      Interest on said damages at the maximum legal rate;

        3.      Punitive damages in an amount to be determined by the Court;

        4.      Attorneys' fees and costs; and

        5.      Such other and further relief as the Court deems appropriate or is subsequently requested.

Dated: June 24, 2011                    /s/ Bernard M. Hansen
                                     Bernard M. Hansen,
                                     Attorney for David Kahn