Bernard M. Hansen, Esq. (Cal. Bar No. 115751)
3465 Camino Del Rio South, Suite 250
San Diego, CA  92108-3905
(619) 283-3371
Facsimile (619) 282-8900
bernardmhansen@sbcglobal.net

Attorney for Third Party Plaintiff,
David Kahn, Individually and as Assignee

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>DAVID KAHN<br><br>                     Debtor.<br><br>Case No. 10-12306-PB7 | ADVERSARY PROCEEDING NO. 10-90637-PB7<br><br>FIRST AMENDED THIRD PARTY COMPLAINT FOR:<br>(A) FRAUD;<br>(B) NEGLIGENT MISREPRESENTATION; AND<br>(C) INTENTIONAL INTERFERENCE WITH BUSINESS OPPORTUNITY |
| COLD SMOKE FINANCE, LLC<br>                    Plaintiff,<br>vs.<br>DAVID KAHN<br>                    Defendant. | |
| DAVID KAHN, INDIVIDUALLY AND AS ASSIGNEE<br>                Third Party Plaintiff.<br>vs.<br>DANIEL ALLEN BROOKS AND MICHAEL ROBERT TRAA<br><br>             Third Party Defendants. | |

*///*

Third Party Plaintiff, David Kahn, Individually and as Assignee, alleges:

JURISDICTION

1.      This action is a proceeding arising in or related to a case under chapter 7 of the Bankruptcy Code.  This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §1334 and General Order 312-D of the United States District Court, Southern District of California. This proceeding is a core proceeding pursuant to 28 U.S.C. §157(b) (2).

PARTIES

2.      Daniel Allen Brooks ("Dan Brooks") is an individual and an attorney.  He is a Third Party Defendant.  Dan Brooks is the principal of Cold Smoke Finance, LLC ("Smoke Finance").  All decisions made by Smoke Finance as alleged herein were made or ratified by Dan Brooks.  All acts undertaken by Smoke Finance as alleged herein were undertaken by or at the direction of Dan Brooks.  At all relevant times mentioned herein, Dan Brooks was the agent and representative of Smoke Finance.  At all relevant times mentioned herein, Dan Brooks held himself out as the agent and representative of Smoke Finance.

3.      Michael Robert Traa ("Mike Traa") is an individual.   At all relevant times mentioned herein, Mike Traa was the agent and representative of Smoke Finance and Dan Brooks and each of them.  At all relevant times mentioned herein, Mike Traa held himself out as the agent and representative of Smoke Finance and Dan Brooks and each of them.

4.      In addition to their relationship and resulting liability as principal and agent, Smoke Finance and Dan Brooks and Mike Traa and each of them conspired together to commit the acts alleged herein.

5.       David Kahn is an individual and the Third Party Plaintiff herein.  Mr. Kahn has claimed his prepetition rights against the Third Party Defendants and each of them as exempt.

6.    On or about July 17, 2010, Kahn Capital Inc doing business as Kahn Capital Management ("KCM"), KCM MC Holdings, LLC and David J. Kahn as Trustee of the David Kahn Trust U.D.T. dated October 1, 1990 ("DKT") and each of them assigned to Mr. Kahn all claims, choses in action, causes of action and claims for relief each of them respectively had against the Third Party Defendants and each of them.

FIRST CLAIM FOR RELIEF<br>(FRAUD)

7.    Mr. Kahn realleges and incorporates by reference paragraphs 1 through 6.

8.    On or about May 17, 2007, Dan Brooks signed a 5 year Confidentiality Agreement in favor of KCM regarding confidential and proprietary information in the possession of Mr. Kahn about The Media Cart Holdings, Inc. ("MCH").  Said information contained a competitive advantage to Mr. Kahn and a favorable investment advantage to Mr. Kahn including Performa's, confidential communications Performa's, and confidential communications including information about Mr. Kahn's private investment holdings.

9.    Prior to May 17, 2007, Mr. Kahn related his knowledge of public information regarding MCH to Smoke Finance, Dan Brooks and Mike Traa and each of them.  Subsequently, Smoke Finance, Dan Brooks and Mike Traa and each of them obtained all or substantially all information available to the public to determine if one or more of them might be interested in investing in MCH.

10.    On or about August 17, 2007, Tim McCallum informed Mike Traa that All-Star Apparel, a Nevada Corporation ("ASA") or Tim McCallum was considering investing up to 50% of funds borrowed from Smoke Finance (said 50% not to exceed $5,000,000 of the maximum borrowing of $10,000,000) in MCH stock or in a position in Mr. Kahn's MCH holdings for the

- 3 -

direct benefit of ASA or Tim McCallum, and also for the indirect benefit of Smoke Finance, Dan Brooks, Mike Traa and each of them.

11.    On or about August 20, 2007, Smoke Finance, Dan Brooks, Mike Traa and each of them met Mr. Kahn at KCM's office in La Jolla, California and a restaurant near-by.  The four main topics of conversation were: (a) the MCH business opportunity; (b) proprietary and confidential information about MCH and Mr. Kahn's investment therein; (c) information regarding Mr. Kahn's belief that MCH could be on the verge of a buyout or similar transaction whereby MCH shareholders, option holders and warrant holders would earn a large return on their MCH investment; and (d) the business relationship between, on the one hand, Smoke Finance, Dan Brooks, Mike Traa and each of them and, on the other hand, ASA and Tim McCallum and each of them.

12.    Relevant to the first three topics (set forth in paragraph 11a, 11b and 11c above), Mr. Kahn informed Smoke Finance, Dan Brooks, Mike Traa and each of them of confidential and private KCM information and Mr. Kahn transferred to Smoke Finance, Dan Brooks, Mike Traa and each of them information that was subject to and protected by the provisions of the Confidentiality Agreement.  For example, Mr. Kahn informed the Smoke Finance, Dan Brooks, Mike Traa and each of them that beginning in August 2006 thru October 2006, Mr. Kahn invested $5,000,000 into MCH and held substantial stock interests and related interests in MCH. Also, Mr. Kahn informed the Smoke Finance, Dan Brooks, Mike Traa and each of them that in October 2006, he had invested $1,000,000 in a private financing agreement (loan) with the MCH founder regarding certain other entities holding MCH stock, and potential options and warrants that was not public information.

13.    Relevant to the fourth topic (set forth in paragraph 11d above), on or about August 20, 2007 Mr. Kahn told Smoke Finance, Dan Brooks, Mike Traa and each of them at their

- 4 -

meeting that Mr. Kahn held a 10% interest in ASA and any entity that owned or sold the ASA patented products dating back to a 1999 Agreement with Tim McCallum and Frank Del Pizzo, Jr. Smoke Finance, Dan Brooks, Mike Traa and each of them confirmed their knowledge of this prior business relationship and Mr. Kahn 10% ownership of the ASA patents in emails exchanged between Dan Brooks and Mike Traa during September 2008. On January 4, 2010, Cold Smoke filed a lawsuit against Mr. Kahn claiming Smoke Finance, Dan Brooks and each of them had no knowledge of this prior business relationship and no knowledge of Mr. Kahn's ownership of 10% of ASA or entities that were selling ASA patented products.

14.     On or about November 4, 2007 Tim McCallum confirmed to Mike Traa that (ASA or Tim McCallum) had in fact been allowed to invest in Mr. Kahn's entities position in MCH. On or about August 16, 2008 Mike Traa confirmed to Tim McCallum that Mike Traa had prior knowledge that ASA or Tim McCallum owned a position of approximately 4.5% of MCH, a company with a minimum valuation of $30,000,000 at the time of ASA's or Tim McCallum's investment.

15.     Relevant to the fourth topic (set forth in paragraph 11d above), Smoke Finance, Dan Brooks, Mike Traa and each of them stated and represented to Mr. Kahn:

(a)     Smoke Finance, Dan Brooks, Mike Traa and each of them had entered into prior business relationships with ASA;

(b)     Smoke Finance, Dan Brooks, Mike Traa and each of them were providing millions of dollars in factored purchase order financing loans to ASA;

(c)     ASA was doing a great business with substantial sales that justified the amount of such purchase order financing loans;

(d)     ASA was a credit worthy, thriving business; and

- 5 -

(e)    Smoke Finance, Dan Brooks, Mike Traa and each of them were well pleased with ASA's performance and well pleased with their business relationships with ASA.

16.    The statements and representations made by Smoke Finance, Dan Brooks, Mike Traa and each of them were false:

(a)    Smoke Finance, Dan Brooks, Mike Traa and each of them were not providing millions of dollars in factored purchase order financing loans to ASA.  The truth is that most of the "factored purchase orders" were "conditional purchase orders".  The condition is that ASA first had to acquire licenses on trademarked products.  Most of the "factored purchase orders" were not "factored purchase orders", but were "conditional purchase orders" that would still be dependent on market conditions even with the necessary licenses;

(b)    ASA was not doing a great business with substantial sales that justified the amount of ASA loans;

(c)    ASA was not a credit worthy, thriving business.  No traditional lender or even a prudent hard money lender would have made loans to ASA in either the amount, terms or frequency as Smoke Finance; and

(d)    No reasonable lender would have been well pleased with ASA's performance or well pleased with its business relationship with ASA, if such lender would have performed proper due diligence in deciding whether to make contingent purchase order financing loans and no reasonable lender would have been well pleased with ASA's performance or well pleased with its business relationship with ASA, if the lender performed proper due diligence monitoring the acquisition of the required licenses necessary to effect the repayment of the contingent purchase order financing loans that would be subject to market conditions.

17.    Smoke Finance, Dan Brooks, Mike Traa and each of them were reckless in making the statements in paragraphs 15 (b-e) and could not have reasonably believed them for the reasons set forth in paragraphs 8-16.

18.    Smoke Finance, Dan Brooks, Mike Traa and each of them undertook little or no due diligence of ASA before making a series of contingent purchase order financing loans totaling millions of dollars, including, but not limited to:

(a)    Smoke Finance, Dan Brooks, Mike Traa and each of them did not have normal or customary policies or procedures in place to make contingent purchase order financing loans with a reasonable amount of risk or to make contingent purchase order financing loans to ASA;

(b)    Smoke Finance, Dan Brooks, Mike Traa and each of them failed to ask for any normal and customary documents a prudent lender would ask for prior to making millions of dollars of loans;

(c)    Smoke Finance, Dan Brooks, Mike Traa and each of them failed to adequately investigate ASA's current or past financial condition; and

(d)    Smoke Finance, Dan Brooks, Mike Traa and each of them failed to adequately investigate ASA's ability to repay the contingent purchase order financing loans and failed to verify that there were in fact licenses that could lead to actual purchase orders that would still be dependent on market conditions even with the necessary licenses.

19.    Smoke Finance, Dan Brooks, Mike Traa and each of them failed adequately to monitor the progress of the licenses required to obtain actual purchase orders on trademarked products that would lead to the repayment of its contingent purchase order financing loans to ASA. Smoke Finance, Dan Brooks, Mike Traa and each of them did not have normal or customary policies or procedures in place to monitor the repayment of contingent purchase order financing loans or monitor the progress of the licenses required to obtain actual purchase orders

on trademarked products dependant on market conditions that would lead to the repayment of ASA's contingent purchase order financing loans.  Smoke Finance, Dan Brooks, Mike Traa and each of them made no effort to verify the amount of ASA's actual purchase order sales.

20.    Additionally, Smoke Finance, Dan Brooks, Mike Traa and each of them failed to take reasonable action when ASA defaulted on the contingent purchase order financing loans. Smoke Finance, Dan Brooks, Mike Traa and each of them did not have normal or customary policies or procedures in place to collect on defaulted loans or to collect on ASA's defaulted loans.

21.    Smoke Finance, Dan Brooks, Mike Traa and each of them made said misrepresentations with the intent to deceive Mr. Kahn and have him rely on them.  Specifically, Smoke Finance, Dan Brooks, Mike Traa and each of them knew that on or about August 17, 2007, ASA or Tim McCallum was speaking with Mr. Kahn about a transaction that can generally be described as:

(a)    ASA or Tim McCallum would invest up to $5,000,000 position in MCH stock or a $5,000,000 position in Mr. Kahn's MCH holdings. Subsequently, on or about November 4, 2007, Tim McCallum confirmed to Mike Traa that ASA or Tim McCallum had in fact been allowed to invest in MCH or Mr. Kahn's position in MCH.  On or about August 16, 2008 Mike Traa stated to Tim McCallum that Mike Traa was previously informed and believed Tim McCallum owned a position of approximately 4.5% of MCH, a company with a minimum valuation of Thirty Million Dollars $30,000,000 at the time of investment. ASA or Tim McCallum in fact agreed to invest $1,000,000 with Mr. Kahn to purchase a profit participation position in Mr. Kahn's MCH holdings.  Purchasing a position in Mr. Kahn's MCH holdings had distinct economic advantages over purchasing MCH stock directly from MCH;

(b)      KCM agreed to give line of credit financing to ASA or Tim McCallum with a repayment term longer than that being currently provided by Smoke Finance, Dan Brooks, Mike Traa and each of them; and

(c)      Tim McCallum would transfer 10% of his current holdings of All-Star Apparel stock to Mr. Kahn or one of his entities as part of Mr. Kahn's and ASA or Tim McCallum's MCH profit participation agreement.

22.      Smoke Finance, Dan Brooks, Mike Traa and each of them made said misrepresentations to Mr. Kahn so that Mr. Kahn would enter the transaction described in the previous paragraph.  Said transaction would be a direct benefit to Smoke Finance, Dan Brooks, Mike Traa and each of them as Tim McCallum stated on or about August 17, 2007 in emails to Mike Traa.  Smoke Finance, Dan Brooks, Mike Traa and each of them believed there was a huge upside to MCH and investing in Mr. Kahn's MCH holdings was economically superior to investing directly with MCH or its founder.  The Mr. Kahn's $1,000,000 MCH deal was not open to Smoke Finance, Dan Brooks, Mike Traa and each of them.  Smoke Finance, Dan Brooks, Mike Traa and each of them could take advantage of this deal only through ASA or Tim McCallum.  Also, if ASA or Tim McCallum were someday unable to repay its loans burdened with exorbitant "consulting fees", Smoke Finance, Dan Brooks, Mike Traa and each of them believed it could seize this investment with Mr. Kahn as part of the "Loan to Own" business policy of Smoke Finance, Dan Brooks, Mike Traa and each of them.  Second, Smoke Finance, Dan Brooks, Mike Traa and each of them knew or should have known the terms of the loans were too short to cover the licensing, the production, distribution and accounting cycle for the sale of ASA products.  Smoke Finance, Dan Brooks, Mike Traa and each of them wanted a second lender making longer term loans to ASA for their benefit.

23.    Mr. Kahn reasonably relied on the misrepresentations of Smoke Finance, Dan Brooks, Mike Traa and each of them.  Smoke Finance, Dan Brooks, Mike Traa and each of them appeared to be knowledgeable and competent business people.  Additionally, when Smoke Finance, Dan Brooks, Mike Traa and each of them were informed of the MCH investment opportunity, they acted as prudent investors and immediately started their own professional and comprehensive due diligence.

24.    It was common knowledge among Smoke Finance, Dan Brooks, Mike Traa and each of them, Tim McCallum, Kent Purdy, Frank Del Pizzo, Paul Duffy, Jeff Kodrick ( Hatworld LIDS buyer), Bruce Bridges ( IMC Licensing), Brown-Forman (Jack Daniels Licensing entity), Susan Buckmaster (Jack Daniels Licensing Director ), Doug Lindberg  (The U.S. National Sales Representative for the cap manufacturer Asian Sourcing International LTD) that the ASA Hatworld LIDS purchase orders were pending ASA acquiring licenses to sell trademarked products.  Mr. Kahn was not privy to this information and did not discover the pending nature of the contingent purchase orders until late January 2010 after the litigation was filed by Smoke Finance.  Smoke Finance, Dan Brooks, Mike Traa and each of them were aware of this fact or should have been at the time of filing the Complaint against Mr. Kahn on or about January 4, 2010.

25.    Based on the misrepresentations of Smoke Finance, Dan Brooks, Mike Traa and each of them, Mr. Kahn went forward with a three part sale of the Mr. Kahn MCH profit participation position to ASA or Tim McCallum and suffered monetary damages as a direct result.  As part of that transaction, Mr. Kahn spent $1,000,000 buying MCH stock from the founder of MCH.  Mr. Kahn would not have made this purchase, but for the misrepresentations of Smoke Finance, Dan Brooks, Mike Traa and each of them. The value of this stock fell from a

purchase price of $1,000,000 to $316,888 at the time of its subsequent sale resulting in damages to Mr. Kahn of $683,112 plus interest and the legal fees to collect.

26.     Based on the misrepresentations of Smoke Finance, Dan Brooks, Mike Traa and each of them, on or about February 28, 2008 Mr. Kahn paid Smoke Finance, Dan Brooks and each of them an additional $110,000 in interest and fees for a short term loan to expedite the purchase of the $1,000,000 in MCH stock from the founder.  This is an additional $110,000 in damages plus interest and the legal fees to collect.

27.     Based on the misrepresentations of Smoke Finance, Dan Brooks, Mike Traa and each of them, KCM loaned up to $600,000 to ASA or Tim McCallum on a line of credit.  ASA or Tim McCallum failed to repay $250,000 of the line of credit loans.  There is now due, owing and unpaid the sum of approximately $250,000.  Thus, Mr. Kahn has been damaged by the misrepresentations of Smoke Finance, Dan Brooks, Mike Traa and each of them in the amount of $250,000 plus interest and the legal fees to collect.

28.     In August of 2008, Smoke Finance, Dan Brooks, Mike Traa and each of them contacted Mr. Kahn and misrepresented that:

(a)     Smoke Finance, Dan Brooks, Mike Traa and each of them had no knowledge of the ASA or Tim McCallum investment in Mr. Kahn's position in MCH.  In fact, in late October 2007, Tim McCallum stated to Mr. Kahn prior to Mr. Kahn accepting an investment from ASA or Tim McCallum that Smoke Finance, Dan Brooks, Mike Traa and each of them knew of the ASA or Tim McCallum investment in Mr. Kahn's position in MCH; and

(b)     Smoke Finance, Dan Brooks, Mike Traa and each of them had loaned ASA millions of dollars on actual purchase orders and the ASA loaned funds were to be strictly be used for the manufacture of caps and no other purpose or investment. Both of these statements

above were false.  Promissory Notes with ASA created and executed by Cold Smoke and ASA contained no such limitation.

29.    Based on the misrepresentations set forth above, Mr. Kahn agreed to establish a balance owing to ASA or Tim McCallum of $750,000 to refund the ASA or Tim McCallum investment in a position in Mr. Kahn's MCH holdings.  A consideration Mr. Kahn would not have approved if Mr. Kahn was not mislead by said misrepresentations.

30.    Based on misrepresentations described above, Mr. Kahn allowed ASA or Tim McCallum to purchase a 20% profit participation in KCM MC Holding LLC with a portion of the line of credit resulting in a significant loss to Mr. Kahn.  $246,500 of the purchase price came from the $750,000 line of credit Mr. Kahn gave to ASA or Tim McCallum.  Said misrepresentations essentially convinced Mr. Kahn to provide the credit to ASA or Tim McCallum to buy Mr. Kahn's own asset at a severe discount.  Further, Smoke Finance, Dan Brooks, Mike Traa and each of them believed they could benefit from this Agreement because they believed they could seize this investment from ASA or Tim McCallum as part of their "Loan to Own" business practices.  Mr. Kahn paid $510,000 for the 20% of KCM MC Holding LLC and thus Mr. Kahn has been damaged in the amount of $510,000 plus interest and the legal fees to collect.

31.    A key consideration of the Agreement for the purchase of the 20% profit participation of KCM MC Holding LLC and the Purchase and Settlement Agreement of Mr. Kahn's 10% interest of any company selling the ASA patented products was an indemnity of Mr. Kahn, KCM and DKT by (ASA and Tim McCallum) from any claims or litigation.  ASA and McCallum have failed to indemnify Mr. Kahn, KC and DKT and have failed to pay any of costs of litigation and the losses incurred caused by said misrepresentations.  Mr. Kahn has been damaged in the approximate amount of $150,000 plus interest and the legal fees to collect.

32.    Based on misrepresentations described above, Mr. Kahn allowed ASA or Tim McCallum to purchase Mr. Kahn's 10% interest in Tim McCallum's stock of ASA and of any company that sold the ASA patented products for $500,000 from the line of credit resulting in a significant loss to Mr. Kahn.  $500,000 of the purchase price came from the $750,000 line of credit Mr. Kahn gave to ASA or Tim McCallum.  Said misrepresentations essentially convinced Mr. Kahn to provide the credit to ASA or Tim McCallum to buy Mr. Kahn's own asset at a severe discount.  Further, Smoke Finance, Dan Brooks, Mike Traa and each of them believed they could benefit from this Agreement because they believed they could seize this investment from ASA or Tim McCallum as part of their "Loan to Own" business practices.  Mr. Kahn has been damaged in the amount of $500,000 plus interest and the legal fees to collect.

33.    The acts of Smoke Finance, Dan Brooks, Mike Traa and each of them mandate an award of punitive damages in an amount to be determined by the Court.

SECOND CLAIM FOR RELIEF
(NEGLIGENT MISREPRESENTATION)

38.    Mr. Kahn realleges and incorporates by reference paragraphs 1 through 33.

39.    On or about May 17, 2007, Dan Brooks signed a 5 year Confidentiality Agreement in favor of KCM regarding confidential and proprietary information in the possession of Mr. Kahn about The Media Cart Holdings, Inc. ("MCH").  Said information contained a competitive advantage to Mr. Kahn and a favorable investment advantage to Mr. Kahn including Performa's, confidential communications Performa's, and confidential communications including information about Mr. Kahn's private investment holdings.

40.    Prior to May 17, 2007, Mr. Kahn related his knowledge of public information regarding MCH to Smoke Finance, Dan Brooks and Mike Traa and each of them.  Subsequently, Smoke Finance, Dan Brooks and Mike Traa and each of them obtained all or substantially all

information available to the public to determine if one or more of them might be interested in investing in MCH.

41.     On or about August 17, 2007, Tim McCallum informed Mike Traa that All-Star Apparel, a Nevada Corporation ("ASA") or Tim McCallum was considering investing up to 50% of funds borrowed from Smoke Finance (said 50% not to exceed $5,000,000 of the maximum borrowing of $10,000,000) in MCH stock or in a position in Mr. Kahn's MCH holdings for the direct benefit of ASA or Tim McCallum, and also for the indirect benefit of Smoke Finance, Dan Brooks, Mike Traa and each of them.

42.     On or about August 20, 2007, Smoke Finance, Dan Brooks, Mike Traa and each of them met Mr. Kahn at KCM's office in La Jolla, California and a restaurant near-by.  The four main topics of conversation were: (a) the MCH business opportunity; (b) proprietary and confidential information about MCH and Mr. Kahn's investment therein; (c) information regarding Mr. Kahn's belief that MCH could be on the verge of a buyout or similar transaction whereby MCH shareholders, option holders and warrant holders would earn a large return on their MCH investment; and (d) the business relationship between, on the one hand, Smoke Finance, Dan Brooks, Mike Traa and each of them and, on the other hand, ASA and Tim McCallum and each of them.

43.     Relevant to the first three topics, Mr. Kahn informed Smoke Finance, Dan Brooks, Mike Traa and each of them of confidential and private KCM information and Mr. Kahn transferred to Smoke Finance, Dan Brooks, Mike Traa and each of them information that was subject to and protected by the provisions of the Confidentiality Agreement.  For example, Mr. Kahn informed the Smoke Finance, Dan Brooks, Mike Traa and each of them that beginning in August 2006 thru October 2006, Mr. Kahn invested $5,000,000 into MCH and held substantial stock interests and related interests in MCH.  Also, Mr. Kahn informed the Smoke Finance, Dan

Brooks, Mike Traa and each of them that in October 2006, he had invested $1,000,000 in a private financing agreement (loan) with the MCH founder regarding certain other entities holding MCH stock, and potential options and warrants that was not public information.

44.    Relevant to the fourth topic, on or about August 20, 2007 Mr. Kahn told Smoke Finance, Dan Brooks, Mike Traa and each of them at their meeting that Mr. Kahn held a 10% interest in ASA and any entity that owned or sold the ASA patented products dating back to a 1999 Agreement with Tim McCallum and Frank Del Pizzo, Jr.   Smoke Finance, Dan Brooks, Mike Traa and each of them confirmed their knowledge of this prior business relationship and Mr. Kahn 10% ownership of the ASA patents in emails exchanged between Dan Brooks and Mike Traa during September 2008.  On January 4, 2010, Cold Smoke filed a lawsuit against Mr. Kahn claiming Smoke Finance, Dan Brooks and each of them had no knowledge of this prior business relationship and no knowledge of Mr. Kahn's ownership of 10% of ASA or entities that were selling ASA patented products.

45.    On or about November 4, 2007 Tim McCallum confirmed to Mike Traa that (ASA or Tim McCallum) had in fact been allowed to invest in Mr. Kahn's entities position in MCH.   On or about August 16, 2008 Mike Traa confirmed to Tim McCallum that Mike Traa had prior knowledge that ASA or Tim McCallum owned a position of approximately 4.5% of MCH, a company with a minimum valuation of $30,000,000 at the time of ASA's or Tim McCallum's investment.

46.    Relevant to the fourth topic, Smoke Finance, Dan Brooks, Mike Traa and each of them stated and represented to Mr. Kahn:

(a)    Smoke Finance, Dan Brooks, Mike Traa and each of them had entered into prior business relationships with ASA;

(b)    Smoke Finance, Dan Brooks, Mike Traa and each of them were providing millions of dollars in factored purchase order financing loans to ASA;

(c)    ASA was doing a great business with substantial sales that justified the amount of such purchase order financing loans;

(d)    ASA was a credit worthy, thriving business; and

(e)    Smoke Finance, Dan Brooks, Mike Traa and each of them were well pleased with ASA's performance and well pleased with their business relationships with ASA.

47.    The statements and representations made by Smoke Finance, Dan Brooks, Mike Traa and each of them were false:

(a)    Smoke Finance, Dan Brooks, Mike Traa and each of them were not providing millions of dollars in factored purchase order financing loans to ASA.  The truth is that most of the "factored purchase orders" were "conditional purchase orders".  The condition is that ASA first had to acquire licenses on trademarked products.  Most of the "factored purchase orders" were not "factored purchase orders", but were "conditional purchase orders" that would still be dependent on market conditions even with the necessary licenses;

(b)    ASA was not doing a great business with substantial sales that justified the amount of ASA loans;

(c)    ASA was not a credit worthy, thriving business.  No traditional lender or even a prudent hard money lender would have made loans to ASA in either the amount, terms or frequency as Smoke Finance; and

(d)    No reasonable lender would have been well pleased with ASA's performance or well pleased with its business relationship with ASA, if such lender would have performed proper due diligence in deciding whether to make contingent purchase order financing loans and no reasonable lender would have been well pleased with ASA's performance or well pleased

with its business relationship with ASA, if the lender performed proper due diligence monitoring the acquisition of the required licenses necessary to effect the repayment of the contingent purchase order financing loans that would be subject to market conditions.

48.     Smoke Finance, Dan Brooks, Mike Traa and each of them were reckless in making the statements in paragraphs 46 (b-e) and could not have reasonably believed them for the reasons set forth above.

49.     Smoke Finance, Dan Brooks, Mike Traa and each of them undertook little or no due diligence of ASA before making a series of contingent purchase order financing loans totaling millions of dollars, including, but not limited to:

(a)     Smoke Finance, Dan Brooks, Mike Traa and each of them did not have normal or customary policies or procedures in place to make contingent purchase order financing loans with a reasonable amount of risk or to make contingent purchase order financing loans to ASA;

(b)     Smoke Finance, Dan Brooks, Mike Traa and each of them failed to ask for any normal and customary documents a prudent lender would ask for prior to making millions of dollars of loans;

(c)     Smoke Finance, Dan Brooks, Mike Traa and each of them failed to adequately investigate ASA's current or past financial condition; and

(d)     Smoke Finance, Dan Brooks, Mike Traa and each of them failed to adequately investigate ASA's ability to repay the contingent purchase order financing loans and failed to verify that there were in fact licenses that could lead to actual purchase orders that would still be dependent on market conditions even with the necessary licenses.

50.     Smoke Finance, Dan Brooks, Mike Traa and each of them failed adequately to monitor the progress of the licenses required to obtain actual purchase orders on trademarked products that would lead to the repayment of its contingent purchase order financing loans to

ASA. Smoke Finance, Dan Brooks, Mike Traa and each of them did not have normal or customary policies or procedures in place to monitor the repayment of contingent purchase order financing loans or monitor the progress of the licenses required to obtain actual purchase orders on trademarked products dependant on market conditions that would lead to the repayment of ASA's contingent purchase order financing loans.  Smoke Finance, Dan Brooks, Mike Traa and each of them made no effort to verify the amount of ASA's actual purchase order sales.

51.    Additionally, Smoke Finance, Dan Brooks, Mike Traa and each of them failed to take reasonable action when ASA defaulted on the contingent purchase order financing loans. Smoke Finance, Dan Brooks, Mike Traa and each of them did not have normal or customary policies or procedures in place to collect on defaulted loans or to collect on ASA's defaulted loans.

52.    Smoke Finance, Dan Brooks, Mike Traa and each of them made said misrepresentations with the intent to deceive Mr. Kahn and have him rely on them.  Specifically, Smoke Finance, Dan Brooks, Mike Traa and each of them knew that on or about August 17, 2007, ASA or Tim McCallum was speaking with Mr. Kahn about a transaction that can generally be described as:

(a)    ASA or Tim McCallum would invest up to $5,000,000 position in MCH stock or a $5,000,000 position in Mr. Kahn's MCH holdings. Subsequently, on or about November 4, 2007, Tim McCallum confirmed to Mike Traa that ASA or Tim McCallum had in fact been allowed to invest in MCH or Mr. Kahn's position in MCH.  On or about August 16, 2008 Mike Traa stated to Tim McCallum that Mike Traa was previously informed and believed Tim McCallum owned a position of approximately 4.5% of MCH, a company with a minimum valuation of Thirty Million Dollars $30,000,000 at the time of investment. ASA or Tim McCallum in fact agreed to invest $1,000,000 with Mr. Kahn to purchase a profit participation

position in Mr. Kahn's MCH holdings.  Purchasing a position in Mr. Kahn's MCH holdings had distinct economic advantages over purchasing MCH stock directly from MCH;

(b)     KCM agreed to give line of credit financing to ASA or Tim McCallum with a repayment term longer than that being currently provided by Smoke Finance, Dan Brooks, Mike Traa and each of them; and

(c)     Tim McCallum would transfer 10% of his current holdings of All-Star Apparel stock to Mr. Kahn or one of his entities as part of Mr. Kahn's and ASA or Tim McCallum's MCH profit participation agreement.

53.     Smoke Finance, Dan Brooks, Mike Traa and each of them made said misrepresentations to Mr. Kahn so that Mr. Kahn would enter the transaction described in the previous paragraph.  Said transaction would be a direct benefit to Smoke Finance, Dan Brooks, Mike Traa and each of them as Tim McCallum stated on or about August 17, 2007 in emails to Mike Traa.  Smoke Finance, Dan Brooks, Mike Traa and each of them believed there was a huge upside to MCH and investing in Mr. Kahn's MCH holdings was economically superior to investing directly with MCH or its founder.  The Mr. Kahn's $1,000,000 MCH deal was not open to Smoke Finance, Dan Brooks, Mike Traa and each of them.  Smoke Finance, Dan Brooks, Mike Traa and each of them could take advantage of this deal only through ASA or Tim McCallum.  Also, if ASA or Tim McCallum were someday unable to repay its loans burdened with exorbitant "consulting fees", Smoke Finance, Dan Brooks, Mike Traa and each of them believed it could seize this investment with Mr. Kahn as part of the "Loan to Own" business policy of Smoke Finance, Dan Brooks, Mike Traa and each of them.  Second, Smoke Finance, Dan Brooks, Mike Traa and each of them knew or should have known the terms of the loans were too short to cover the licensing, the production, distribution and accounting cycle for the

sale of ASA products.  Smoke Finance, Dan Brooks, Mike Traa and each of them wanted a second lender making longer term loans to ASA for their benefit.

54.    Mr. Kahn reasonably relied on the misrepresentations of Smoke Finance, Dan Brooks, Mike Traa and each of them.  Smoke Finance, Dan Brooks, Mike Traa and each of them appeared to be knowledgeable and competent business people.  Additionally, when Smoke Finance, Dan Brooks, Mike Traa and each of them were informed of the MCH investment opportunity, they acted as prudent investors and immediately started their own professional and comprehensive due diligence.

55.     It was common knowledge among Smoke Finance, Dan Brooks, Mike Traa and each of them, Tim McCallum, Kent Purdy, Frank Del Pizzo, Paul Duffy, Jeff Kodrick ( Hatworld LIDS buyer), Bruce Bridges ( IMC Licensing), Brown-Forman (Jack Daniels Licensing entity), Susan Buckmaster (Jack Daniels Licensing Director ), Doug Lindberg  (The U.S. National Sales Representative for the cap manufacturer Asian Sourcing International LTD) that the ASA Hatworld LIDS purchase orders were pending ASA acquiring licenses to sell trademarked products.  Mr. Kahn was not privy to this information and did not discover the pending nature of the contingent purchase orders until late January 2010 after the litigation was filed by Smoke Finance.  Smoke Finance, Dan Brooks, Mike Traa and each of them were aware of this fact or should have been at the time of filing the Complaint against Mr. Kahn on or about January 4, 2010.

56.    Based on the misrepresentations of Smoke Finance, Dan Brooks, Mike Traa and each of them, Mr. Kahn went forward with a three part sale of the Mr. Kahn MCH profit participation position to ASA or Tim McCallum and suffered monetary damages as a direct result.  As part of that transaction, Mr. Kahn spent $1,000,000 buying MCH stock from the founder of MCH.  Mr. Kahn would not have made this purchase, but for the misrepresentations

of Smoke Finance, Dan Brooks, Mike Traa and each of them. The value of this stock fell from a purchase price of $1,000,000 to $316,888 at the time of its subsequent sale resulting in damages to Mr. Kahn of $683,112 plus interest and the legal fees to collect.

57.    Based on the misrepresentations of Smoke Finance, Dan Brooks, Mike Traa and each of them, on or about February 28, 2008 Mr. Kahn paid Smoke Finance, Dan Brooks and each of them an additional $110,000 in interest and fees for a short term loan to expedite the purchase of the $1,000,000 in MCH stock from the founder.  This is an additional $110,000 in damages plus interest and the legal fees to collect.

58.    Based on the misrepresentations of Smoke Finance, Dan Brooks, Mike Traa and each of them, KCM loaned up to $600,000 to ASA or Tim McCallum on a line of credit.  ASA or Tim McCallum failed to repay $250,000 of the line of credit loans.  There is now due, owing and unpaid the sum of approximately $250,000.  Thus, Mr. Kahn has been damaged by the misrepresentations of Smoke Finance, Dan Brooks, Mike Traa and each of them in the amount of $250,000 plus interest and the legal fees to collect.

59.    In August of 2008, Smoke Finance, Dan Brooks, Mike Traa and each of them contacted Mr. Kahn and misrepresented that:

(a)    Smoke Finance, Dan Brooks, Mike Traa and each of them had no knowledge of the ASA or Tim McCallum investment in Mr. Kahn's position in MCH.  In fact, in late October 2007, Tim McCallum stated to Mr. Kahn prior to Mr. Kahn accepting an investment from ASA or Tim McCallum that Smoke Finance, Dan Brooks, Mike Traa and each of them knew of the ASA or Tim McCallum investment in Mr. Kahn's position in MCH; and

(b)     Smoke Finance, Dan Brooks, Mike Traa and each of them had loaned ASA millions of dollars on actual purchase orders and the ASA loaned funds were to be strictly be used for the manufacture of caps and no other purpose or investment. Both of these statements

above were false.  Promissory Notes with ASA created and executed by Cold Smoke and ASA contained no such limitation.

60.    Based on the misrepresentations set forth above, Mr. Kahn agreed to establish a balance owing to ASA or Tim McCallum of $750,000 to refund the ASA or Tim McCallum investment in a position in Mr. Kahn's MCH holdings.  A consideration Mr. Kahn would not have approved if Mr. Kahn was not mislead by said misrepresentations.

61.    Based on misrepresentations described above, Mr. Kahn allowed ASA or Tim McCallum to purchase a 20% profit participation in KCM MC Holding LLC with a portion of the line of credit resulting in a significant loss to Mr. Kahn.  $246,500 of the purchase price came from the $750,000 line of credit Mr. Kahn gave to ASA or Tim McCallum.  Said misrepresentations essentially convinced Mr. Kahn to provide the credit to ASA or Tim McCallum to buy Mr. Kahn's own asset at a severe discount.  Further, Smoke Finance, Dan Brooks, Mike Traa and each of them believed they could benefit from this Agreement because they believed they could seize this investment from ASA or Tim McCallum as part of their "Loan to Own" business practices.  Mr. Kahn paid $510,000 for the 20% of KCM MC Holding LLC and thus Mr. Kahn has been damaged in the amount of $510,000 plus interest and the legal fees to collect.

62.    A key consideration of the Agreement for the purchase of the 20% profit participation of KCM MC Holding LLC and the Purchase and Settlement Agreement of Mr. Kahn's 10% interest of any company selling the ASA patented products was an indemnity of Mr. Kahn, KCM and DKT by (ASA and Tim McCallum) from any claims or litigation.  ASA and McCallum have failed to indemnify Mr. Kahn, KC and DKT and have failed to pay any of costs of litigation and the losses incurred caused by said misrepresentations.  Mr. Kahn has been damaged in the approximate amount of $150,000 plus interest and the legal fees to collect.

63.    Based on misrepresentations described above, Mr. Kahn allowed ASA or Tim McCallum to purchase Mr. Kahn's 10% interest in Tim McCallum's stock of ASA and of any company that sold the ASA patented products for $500,000 from the line of credit resulting in a significant loss to Mr. Kahn.  $500,000 of the purchase price came from the $750,000 line of credit Mr. Kahn gave to ASA or Tim McCallum.  Said misrepresentations essentially convinced Mr. Kahn to provide the credit to ASA or Tim McCallum to buy Mr. Kahn's own asset at a severe discount.  Further, Smoke Finance, Dan Brooks, Mike Traa and each of them believed they could benefit from this Agreement because they believed they could seize this investment from ASA or Tim McCallum as part of their "Loan to Own" business practices.  Mr. Kahn has been damaged in the amount of $500,000 plus interest and the legal fees to collect.

64.    The acts of Smoke Finance, Dan Brooks, Mike Traa and each of them mandate an award of punitive damages in an amount to be determined by the Court.

THIRD CLAIM FOR RELIEF
(INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE)

65.    Mr. Kahn realleges and incorporates by reference paragraphs 1 through 64.

66.    Mr. Kahn has a long standing economic relationship with MCH.  In addition to the funds Mr. Kahn has invested, Mr. Kahn has raised money for MCH by contacting third parties and explaining the MCH investment.  Mr. Kahn has served on the Board of Directors.  Presently, Mr. Kahn has an economic relationship with MCH and he strongly believes there will be future economic benefit to him based on this economic relationship as there has been in the past.

67.    Smoke Finance, Dan Brooks, Mike Traa and each of them were aware of the long standing economic relationship between Mr. Kahn and MCH.

68.    Smoke Finance, Dan Brooks, Mike Traa and each of them committed intentional acts designed to disrupt the relationship, as set forth herein.

69.     Smoke Finance, Dan Brooks, Mike Traa and each of them knew the annual shareholder meeting for MCH was January 11, 2010 and further knew Mr. Kahn was trying to get reelected to the Board of Directors.  In addition to the rights and duties a MCH board member has to influence the direction of MCH, MCH board members receive compensation in the form of options during their tenure.

70.     Smoke Finance, Dan Brooks, Mike Traa and each of them created a plan to torpedo the relationship between Mr. Kahn and MCH, including, but not limited to filing a complaint for fraud and RICO violations on January 4, 2010, a week before the shareholder meeting.

71.     By way of background, on November 05, 2009, Mike Traa sent a fax to Dan Brooks.  At the top of the fax, it states in hand writing: "Dan Didn't want to email".  The email states in relevant part: "As I told Gooch yesterday I have been told Mr. Kahn is bleeding badly right now and doesn't have resources and has been in fact borrowing money again to stay afloat so hitting him sooner rather than later is probably to your advantage."

72.     On January 4, 2010, Smoke Finance, Dan Brooks, Mike Traa and each of them, in the name of Smoke Finance, filed a lawsuit (the "Lawsuit") against Mr. Kahn and three Mr. Kahn entities, which included RICO claims.

73.     On January 5, 2010, Mike Traa sent an email to Dan Brooks stating:
Point being he is now as fragile as he is ever going to get and the stocks [sic] value is as low as it will ever be, so now is the time to push and make things hard for him if you wanted.  I am sure if you sent in your proxy vote or not for the share holder meeting this coming Monday?  I will send you a blank copy (attached) –

I am giving my vote to Thomas for as Mr. Kahn is trying to get a board seat right now in the company and that just can't happen!!
…
He is scrambling trying to get votes right now for the board as well so any stress you can put on his plate this week, will also make loose [sic] some hair…"

74.     On January 6, 2010, Dan Brooks responded to Mike Traa in an email: "He has a fraud lawsuit pending against him.  I would think the board and shareholders would want to wait and see the outcome of that suit before allowing him to be a board member."

75.     Later on January 6, 2010, Mike Traa responded to Dan Brooks: "Good to know – do you have any info that I can give to folks on this by chance?  A PDF file on the suit would be nice to have so I can email it to Brice."

76.     Prior to the annual shareholder meeting, Smoke Finance, Dan Brooks, Mike Traa and each of them informed other shareholders and officers and directors of MCH about Mr. Kahn's alleged bad acts and used the Lawsuit to buttress their allegations.  There were no such bad acts.

77.     On or about January 4, 2010 Cold Smoke filed a lawsuit against Mr. Kahn falsely claiming Smoke Finance, Dan Brooks, Mike Traa and each of them had no knowledge of ASA's or Tim McCallum's investment in a profit participation position of Mr. Kahn's holdings in MCH.

78.     Smoke Finance, Dan Brooks, Mike Traa and each of them lacked probable cause to file the Lawsuit.  Mr. Kahn and three Mr. Kahn entities brought on a motion to dismiss under Rule 12(b) of the F.R.Civ.P.  In response, Smoke Finance, Dan Brooks and each of them voluntarily dismissed the Lawsuit.

79.     Additionally, the Lawsuit was filed with a malicious intent.   First, Smoke Finance, Dan Brooks, Mike Traa and each of them desired to hurt Mr. Kahn's economic relationship with MCH.  The Lawsuit was filed a few days before the annual share holder meeting.  Smoke Finance, Dan Brooks, Mike Traa and each of them immediately communicated the filing of the Lawsuit and the contents of the Lawsuit to other shareholders and officers and directors of MCH.

80.     Second, Smoke Finance, Dan Brooks, Mike Traa and each of them filed the Lawsuit in federal court with the RICO claims "in an attempt to scare Mr. Kahn and force a settlement."

81.     The acts of Smoke Finance, Dan Brooks, Mike Traa and each of them caused an actual disruption, including, but not limited to, some shareholders, officers or directors of MCH withdrew their support from Mr. Kahn in general and also withdrew support for his bid to win a board seat.

82.     Mr. Kahn has suffered direct damages as a result of the acts of the Smoke Finance, Dan Brooks, Mike Traa and each of them.  The specifics include damage to Mr. Kahn's economic relationship with MCH, damage to Mr. Kahn's reputation, damage to Mr. Kahn's ability to raise funds, damage to Mr. Kahn's ability to become a Board member of MCH, damage to Mr. Kahn's ability to acquire additional options and warrants of MCH.  The exact amount of damages has not yet been determined, but the financial losses are substantial.

83.     The acts of Smoke Finance, Dan Brooks, Mike Traa and each of them mandate an award of punitive damages in an amount to be determined by the Court.

RIGHT TO AMEND

84.     Third Party Plaintiff fully reserves his right to file an amended counterclaim or seek judicial leave to file an amended counterclaim.

85.     Mr. Kahn understands: (a) Dan Brooks is the son of Sam A. Brooks, Jr.  Some years ago, Sam A. Brooks, Jr. passed away; (b) Dan Brooks was appointed a fiduciary of his father's estate and any trusts related thereto (the "Sam Brooks' Estate/Trust"); (c) Dan Brooks remained a fiduciary ("Fiduciary-Brooks") and was a fiduciary of the Sam Brooks' Estate/Trust (including any successor in interest to the Sam Brooks' Estate/Trust) at all times referenced herein; and (d) Fiduciary-Brooks may have engaged in activity which makes him liable for the

acts alleged herein.  However, Mr. Kahn would like to further investigate these allegations.  Mr. Kahn expressly reserves the right to amend or seek leave to amend to join additional parties including, but not limited to, Fiduciary-Brooks, Sam Brooks' Estate/Trust and each of them.

PRAYER

Counterclaimants and each of them pray:

A.      On the First and Second Claims for Relief:

1.      $683,112 for the decrease in value of the stock that Mr. Kahn would not have purchased;

2.      Interest on the sum of $683,112 at the maximum legal rate;

3.      $110,000 in loan fees and interest that Mr. Kahn would not have incurred;

4.      Interest on the sum of $110,000 at the maximum legal rate;

5.      $250,000 in unpaid loans;

6.      Interest on the sum of $250,000 at the maximum legal rate;

7.      Legal fees and other damages in excess of $150,000, (and continuing to accrue) caused by All-Star Apparel's breach of the indemnification agreement;

8.      Interest on the sum of $150,000+ at the maximum legal rate;

9.      $510,000 for 20% of KCM MC Holdings LLC;

10.     Interest on the sum of $510,000+ at the maximum legal rate

11.     $500,000 for 10% of All-Star Apparel and any company that sells ASA patented products;

12.     Interest on the sum of $500,000+ at the maximum legal rate;

13.     All damage alleged above in paragraphs 1-87;

14.     Punitive damages in an amount to be determined by the Court;

15.     Attorneys' fees and costs; and

16.    Such other and further relief as the Court deems appropriate or is subsequently requested.

B.    On the Third Claim for Relief:

1.    All monetary damages (the exact amount of monetary damages has not yet been determined) resulting from the acts of the Smoke Finance, Dan Brooks, Mike Traa and each of them, including, but not limited to:

A.    damage to Mr. Kahn's economic relationship with MCH;

B.    damage to Mr. Kahn's reputation;

C.    damage to Mr. Kahn's ability to raise funds;

D.    damage to Mr. Kahn's ability to become a Board member of MCH;

E.    damage to Mr. Kahn's ability to acquire additional options and warrants of MCH;

2.    Interest on said damages at the maximum legal rate;

3.    Punitive damages in an amount to be determined by the Court;

4.    Attorneys' fees and costs; and

5.    Such other and further relief as the Court deems appropriate or is subsequently requested.

Dated: July 14, 2011                          /s/ Bernard M. Hansen
                                                          Bernard M. Hansen
                                                    Attorney for David Kahn